*
THOMAS P. BEKO, ESQ. (#002653)
BRENT L. RYMAN, ESQ. (#008648)
PAUL M. BERTONE, ESQ. (#004533)
ERICKSON, THORPE & SWAINSTON, LTD.
99 West Arroyo Street
P.O. Box 3559
Reno, Nevada 89505
Telephone: (775) 786-3930
*Attorneys for Defendants Elko County,
Munson, Keema and Pitts*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

RICHARD PIKE, an individual

        Plaintiff,

vs.

J. BRAD HESTER, in his official and
individual capacities, SEAN MUNSON, in
his official and individual capacities,
RICK KEEMA, in his official and
individual capacities, JIM PITTS, in his
official and individual capacities, ELKO
COUNTY SHERIFF'S OFFICE, a
government entity and ELKO COUNTY
NEVADA, a government entity,

        Defendants.
_____/

CASE NO: 3:12-cv-00283-RCJ(VPC)

**JOINT, RENEWED SPECIAL
MOTION TO DISMISS PURSUANT
TO THE FEDERAL SUMMARY
JUDGMENT STANDARD**

    COMES NOW, Defendants, J. BRAD HESTER and COUNTY OF ELKO, jointly,

by and through their respective attorneys of record, ERICKSON, THORPE &

SWAINSTON, LTD., THOMAS P. BEKO, ESQ., PAUL M. BERTONE, ESQ., and

BRENT L. RYMAN, ESQ., for Defendant COUNTY OF ELKO, and THORNDAL,


ERICKSON, THORPE &
SWAINSTON, LTD.

1

1  ARMSTRONG, DELK, BALKENBUSH & EISINGER, BRENT T. KOLVET, ESQ., and

2  BRANDON R. PRICE, ESQ. for Defendant J. BRAD HESTER, and present the following

3  Renewed, Joint Special Motion to Dismiss Pursuant to the Federal Summary Judgment

4  Standard.  The instant Motion is a renewal of these Defendants' initial Special Motion to

5  Dismiss (#13), which was previously denied by this Honorable Court's Order (#51) without

6  prejudice to refiling under the summary judgment standard.

7       As with their prior Motion (#13), Defendants' Renewed Motion requests dismissal of

8  some or all of Plaintiff's claims against these Defendants, which necessarily fail because they

9  are based on allegations of activity protected by Nevada's Anti-SLAPP laws and the federal

10  *Noerr-Pennington* doctrine.  Specifically, Plaintiff's federal and state claims for defamation,

11  IIED and invasion of privacy are subject to dismissal, as are all of Plaintiff's claims to the

12  extent they seek to impose liability for good-faith expressions of concern about Plaintiff's

13  suspected illegal drug use or other qualifications for continued public employment by Elko

14  County or the Elko County School District.  (*See, e.g.*, Pl's Compl. (#1), ¶¶ 3(B)-(C), 92-99,

15  100-102, 105-106, 109-110).  Those portions of Plaintiff's suit are properly characterized as

16  a "strategic lawsuit against public policy," and his related state claims are therefore subject

17  to immediate dismissal pursuant to the Anti-SLAPP provisions of NRS 41.635, *et seq.*

18       Defendants' Joint, Renewed Special Motion is made and based upon all of the

19  pleadings and papers herein, as well as the attached Memorandum of Points & Authorities

20  and various evidentiary materials attached hereto.

21      **MEMORANDUM OF POINTS & AUTHORITIES**

22  **I.**    **BRIEF SUMMARY OF ACTION AND CURRENT MOTION**

23      **A.**   **Procedural note.**

24       As noted above, Defendants' instant Motion is a renewal of these Defendants' initial

25  Special Motion to Dismiss (#13), which was previously denied by this Honorable Court's

26  *Order (#51) without prejudice to refiling under the summary judgment standard.  (See,*

27  *Order (#51),* March 5, 2013, p. 11, ll. 12-15) ("If Defendants wish the Court to make a fact-

28  based determination under the Anti-SLAPP statutes, it may do so under a motion for


ERICKSON, THORPE &
SWAINSTON, LTD.

1    summary judgment later, but it may not stay discovery under the state statute at this early

2    stage and ask the Court to make what amounts to a Rule 56(a) determination without the

3    benefit of any discovery).  The parties have now enjoyed the full benefit of discovery, which

4    has revealed evidence confirming the good-faith basis for and protected nature of Defendant

5    Hester's speech forming the basis for Plaintiff's defamation-based claims in this litigation.

6    This evidence is described in detail for the Court below.

7         Although the Court's Order (#51) previously cited the verified nature of Plaintiff's

8    Complaint (#1) a basis for its *sua sponte* discussion that an Anti-SLAPP motion would

9    "presumably" fail under a burden-shifting analysis, Plaintiff's own admissions coupled with

10   the uncontested evidence below show the merit of Defendants' Motion.  Plaintiff may not

11   defeat this Motion through unsupported allegations that Defendant Hester's statements were

12   "malicious" or "false" when the clear evidence demonstrates those statements enjoyed a

13   good-faith basis and were protected.

14        **B.    Claims attacked via this Motion.**

15        This Court's Order (#51) indicated that the claims implicated by Defendants' initial

16   Special Motion (#13) "appear[ed] to be the second claim for defamation against Hester and

17   the tenth claim for 'respondeat superior' against the County, insofar as that claim rests upon

18   Hester's own liability under the second claim."  (Order (#51), p. 11, ll. 22-24).  Defendants

19   wish to confirm that those claims should indeed be dismissed pursuant to this Motion, and

20   also clarify that any other claims based upon allegations of protected conduct by Defendant

21   Hester should be dismissed as well.

22        Such claims include Plaintiff's IIED and "harassment"-based federal claim, which

23   certainly allege that Defendant Hester's protected statements were conducted within a

24   "campaign of harassment."  (*See*, Pl's Compl. (#1), ¶¶ 3(B)-(C)) (Plaintiff claims Defendants

25   Hester and Elko County "violated Plaintiff's substantive due rights of privacy, personal

26   autonomy, liberty and self-dignity secured under the Fourteenth Amendment to the United

27   States Constitution . . . [and] violated Plaintiff's personal rights protected under Nevada law

28   and constituted the torts of Intentional Infliction of Emotional Distress, Defamation, False

1   Imprisonment, and Invasion of Privacy against Plaintiff," based on allegations of Hester's

2   protected activity).  Defendants thus respectfully request not only that Plaintiff's defamation

3   and *respondeat superior* claims be dismissed, but also that **any allegation based upon**

4   **Defendant Hester's protected speech be barred from consideration as evidence or**

5   **introduction at Trial.**

6   **II.   STATEMENT OF FACTS**

7   Via the following Statement of Facts based upon the attached evidence compiled

8   during discovery, Defendants have now supplemented and strengthened the facts and

9   circumstances set forth in their initial Special Motion (#13) for consideration by this Court

10   under the appropriate summary judgment standard.  Based thereon, as described in detail

11   below, Defendants believe they have demonstrated a basis for dismissal of Plaintiff's

12   defamation-based claims, and the burden has shifted to Plaintiff to demonstrate a probability

13   of success of each element of the challenged claims.

14   **A.   Summary of Plaintiff's allegations.**

15   As the Court is by now well aware, this is a case involving allegations by Plaintiff, a

16   former employee of Elko County and Elko County School District, of harassment and

17   impropriety by employees within Elko County Sheriff's Department.   The allegations

18   germane to the instant Special Motion pertain to Plaintiff's defamation-type claims involving

19   statements made by Defendant Brad Hester.[1]   In that regard, Plaintiff alleges Defendant

20   Hester contacted a number of his supervisors to express concerns about Plaintiff's suspected

21   drug use or other qualifications for continued public employment.  Plaintiff bases a number

22   of his claims, asserted against both Defendant Hester and his employer Elko County, upon

23   these factual allegations.[2]

24   _____

25   [1].  Although Defendants strenuously deny that Plaintiff's claims regarding searches of the
     public Jackpot Recreation Center are actionable, those claims are not at issue in this Special
26   Motion to Dismiss.  Defendants will seek dismissal of Plaintiff's remaining claims via separate
     dispositive motions discussing those matters.

27   [2].  Defendants reasonably believe that Plaintiff's allegations regarding Defendant Hester's
     protected activity form the basis only for claims against Defendant Hester and the County.
28   However, to the extent Plaintiff bases any claims against other Defendants, including Defendant
     Hester's supervisors Rick Keema and Sheriff Pitts, these claims are likewise barred.

ERICKSON, THORPE &
SWAINSTON, LTD.

4

1      In his Complaint, Plaintiff alleges Defendant Hester "[m]ade false and malicious

2  statements to Kim Smith, the Dean of Students and Athletic Director of Jackpot Combined

3  School, that Plaintiff was a 'pot head,' 'one of Jackpot's biggest druggies,' and had 'just

4  threw his bong and pipe away a couple of weeks ago.'" (Pl's Compl. (#1), ¶ 2(B)).  Plaintiff

5  also alleges that Defendant Hester made similar statements to "Plaintiff's [other] boss, Lynn

6  Forssberg, Director of Elko County Public Works . . . ." (Pl's Compl. (#1), ¶ 20).  Plaintiff

7  alleges that all of Defendant Hester's related statements were uttered with intention "to

8  portray Plaintiff in a bad light in an effort to have Plaintiff fired . . . ."  (Pl's

9  Compl. (#1), ¶ 19).  These Defendants, however, respectfully assert that Defendant Hester's

10  alleged statements were made in good faith, with the intention of alerting public authorities

11  to his concerns regarding Plaintiff, and are therefore protected as described below.

12     **B.**    **The evidence and admissions obtained in discovery prove the protected**
**nature of Defendant Hester's communications, which were brought in**
13             **good-faith.**

14      Before presenting the detailed legal basis for this assertion, Defendants will first

15  describe the evidence uncovered during discovery, and since the filing of Defendants' initial

16  Special Motion (#13).  In this way, Defendants will demonstrate that the conclusory

17  allegations of Plaintiff's Complaint, verified though they may be, are not sufficient to defeat

18  the protected nature of Defendant Hester's statements.  Summary judgment, for Defendants,

19  is appropriate under both the Anti-SLAPP and *Noerr-Pennington* defenses at this time.

20        **1.**    **Plaintiff's admissions regarding the use of illegal drugs, along with**
**further evidence, shows the good-faith nature of Defendant**
21              **Hester's concerns.**

22      Defendants' initial Motion (#13) was denied by this Court based on the bare

23  allegations of Plaintiff's Complaint.  Although the Complaint is indeed verified, this Court

24  under no obligation to accept conclusory allegations unsupported by affirmative facts in the

25  pleadings or otherwise.  *See, United States v. Philip Morris, Inc.*, 116 F.Supp.2d 116, 121

26  (D.D.C. 2000); *see also, Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (verified

27  complaint may only be considered as opposing affidavit only where based on personal

28  knowledge, setting forth specific, admissible facts); *Lantec, Inc. v. Novell, Inc.*, 306 F.3d

ERICKSON, THORPE &
SWAINSTON, LTD.

1003, 1019 (10th Cir. 2002) (court properly refused to consider verified complaint as summary judgment affidavit where allegations merely conclusory).

With that in mind, Plaintiff's conclusory allegations regarding the "malicious" state of mind held by Defendant Hester should not be given the same weight they enjoyed under the FRCP Rule 12(b)(6) standard outlined in this Court's prior Order (#51). As the Supreme Court has noted, this Court is "not bound to accept as true **a legal conclusion couched as a factual allegation**." *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (emphasis added) (citing *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir. 1981)). Nor is this Court "bound to accept [Plaintiff's] conclusory allegations regarding the legal effect of the facts alleged." *United Mine Workers of America v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085 (4th Cir. 1977).

Quite to the contrary, during the discovery process, the evidence has revealed that Defendant Hester's statements had a good-faith basis, were protected, and were both targeted at procuring a governmental outcome – *i.e.*, that the District or County either encourage Plaintiff to do his job appropriately or take it away from him – and pertained to matters of concern to those governmental entities. This evidence includes a number of revealing admissions from Plaintiff's own testimony. Notably, although Plaintiff claims to have quit several years ago, Plaintiff testified that he was, in fact, a drug user:

> Q:   You don't, I take it, dispute that, in fact, you've used illicit drugs, correct?
>
> A:   Dispute it? In which way?
>
> Q:   Deny that you've used illicit drugs in the past.
>
> A:   One in particular, yeah.
>
> **Q:   You deny it?**
>
> **A:   I don't deny it, not using marijuana.**

(Pike Dep., pp. 103-104, ll. 24-6) (emphasis added); (*see also*, Pike Dep., pp. 105-107, ll. 11-4) (detailing Plaintiff's admitted, illegal use of marijuana).[3]

---

[3].  True, accurate and correct copies of the cited portions from the transcript of Plaintiff's deposition, taken August 28, 2012, along with the caption and reporter's certificate, are attached to Defendants' Motion as "Exhibit 1."

ERICKSON, THORPE & SWAINSTON, LTD.

6

1    In fact, Plaintiff testified that he has actually been terminated from prior employment

2    after testing positive for the use of marijuana.  Specifically, Plaintiff testified as follows:

3            Q:     Did you leave the Peppermill voluntarily?

4            A:     No.

5            **Q:     Why were you terminated from the Peppermill?**

6            **A:     I failed a UA there.**

7            **Q:     And what substance was detected in the UA?**

8            **A:     Marijuana, THC.**

9    (Pike Dep., pp. 41-42, ll. 23-3) (emphasis added).

10    Elaine Taylor is the mother of Plaintiff's son.  Ms. Taylor had lived with Plaintiff for

11    years, and Plaintiff admitted he used marijuana with her in the past.  (Pike Dep., pp. 106-107,

12    ll. 24-4).  Ms. Taylor confirmed Plaintiff is a known marijuana user, and provided this

13    information to Defendants Hester and Munson.  (Taylor Dep., p. 12, ll. 14-22).[4]  She also

14    testified she witnessed Plaintiff distribute marijuana to friends and former coworkers at

15    Cactus Pete's Casino in Jackpot.  (Taylor Dep., pp. 14-15, ll. 19-13).  Ms. Taylor also

16    testified to her belief that she witnessed Plaintiff under the influence of marijuana during the

17    time he was employed with Elko County.  (Taylor Dep., p. 14, ll. 7-18; p. 30, ll. 1-15).

18    Another Jackpot resident, Rosalind Barrus, testified that the gossip around town – stretching

19    back to Plaintiff's days working for Cactus Pete's – was that Plaintiff had "always been a

20    user." (Barrus Dep., p. 23, ll. 5-6).[5]  Ms. Barrus testified she heard that gossip from "[t]he

21    whole town," and that it was not anything new.  (Barrus Dep., p. 23, ll. 1-13; p. 24, ll. 13-24).

22    Such evidence easily supports the conclusion that Defendant Hester's statements to

23    Ms. Smith were made in good faith for the purposes of the immunities at issue here.

24    ///

25    

26    [4].  True, accurate and correct copies of the cited portions from the transcript of Elaine
27    Taylor's deposition, taken March 6, 2013, along with the caption and reporter's certificate, are
      attached to Defendants' Motion as "Exhibit 2."

28    [5].  True, accurate and correct copies of the cited portions from the transcript of Rosalind
      Barrus's deposition, taken March 6, 2013, along with the caption and reporter's certificate, are
      attached to Defendants' Motion as "Exhibit 3."

ERICKSON, THORPE &
SWAINSTON, LTD.

1    Plaintiff, in fact, admitted he knew Defendant Hester's statements regarding the bong

2    and pipe were based on information from Ms. Taylor.   Although Plaintiff denies that

3    Ms. Taylor had accurate knowledge regarding any "bong and pipe" in his possession, a third

4    party such as Defendant Hester could easily believe Ms. Taylor was in a position to have

5    accurate information regarding Plaintiff's drug habits. (*See*, Pike Dep., p. 108, ll. 2-14).  And

6    Plaintiff himself admitted that Ms. Taylor personally accused him of throwing away his bong

7    and pipe even before he learned of Defendant Hester's statements to Kim Smith:

8    Q:    Have you ever used marijuana through the use of any
           type of device?

9    A:    Not that was mine.

10   Q:    Did you ever possess a device for the use of marijuana?

11   A:    No.

12   **Q:    You did, in fact, have a discussion with Elaine Taylor
13          about disposal of drug paraphernalia?**

14   **A:    She accused me of throwing it away just recently, and
            I didn't have any.  That's why I questioned her why
15          she thought it.**

16   Q:    When did that discussion occur?

17   A:    August or September 2011.  It may have been late July.
18         I believe it was right at the end of the summer of 2011.

        Q:    And you were still seeing her on a periodic basis, on
19            again/off again at that time?

20   A:    At the time we were fighting.

21   Q:    But were you still seeing her off again and on again?

22   A:    Yes.  We saw each other later that fall of 2011.

23   (Pike Dep., p. 115, ll. 4-25) (emphasis added).

24   After Plaintiff put the clues together and learned that Mr. Hester's source for this

25   information was Ms. Taylor – as Mr. Hester testified at the TPO extension hearing – Plaintiff

26   picked up the telephone to confront her about this matter:

27   ///

28   ///

ERICKSON, THORPE &
SWAINSTON, LTD.

8

1     Q:    All right.  Upon hearing that information, did you ever contact her about it?

2

3     A:    I asked her why she would say that, yeah.

4     Q:    And what did she say in response to your contact, your question?

5     A:    She says, I had information that you did.  That was it.

6     Q:    She had information that you did what?

7     A:    That I disposed of my bong and pipe.

8     Q:    So she never, she never denied having made that statement.  What she said to you was that she had information from somebody else about you disposing of your bong and pipe; is that correct?

9

10

11     A:    She told me that she told Deputy Munson and Brad Hester that I had just recently thrown my bong and pipe away.

12

13  (Pike Dep., pp. 118-119, ll. 24-14); (*see also*, Pike Dep., pp. 123-125, ll. 12-19).

14       Ms. Taylor confirmed at deposition that she provided information to Defendants

15  Hester and Munson that Plaintiff "supposedly" recently disposed of his marijuana

16  paraphernalia, although she did not believe that Plaintiff had changed his ways.  (Taylor

17  Dep., pp. 16-20, ll. 6-12).  She also confirmed that Plaintiff telephoned to confront her upon

18  learning that she provided this information to Defendants Hester and Munson, and that he

19  was not pleased.  (Taylor Dep., pp. 20-21, ll. 19-21).  And Ms. Taylor certainly did not

20  disagree with the statements Mr. Hester made to Ms. Smith:

21     Q:    At the time you had this conversation with Mr. Hester and Mr. Munson two years ago by the Four Jacks, did you tell them that Mr. Pike was one of the biggest potheads in Jackpot?

22

23     A:    I don't recall saying that.  I easily could have.

24

25  (Taylor Dep., pp. 40-41, ll. 21-1).

26  ///

27  ///

28  ///

1       And there is no dispute that Mr. Hester had received at least some information that

2  illegal drugs were available for sale at the Jackpot Recreation Center under Plaintiff's watch.

3  This information came in the way of a "lead" from an NDI Detective investigating the sale

4  of illegal drugs in Jackpot.  That detective testified that he informed Mr. Hester, some time

5  before he went to Ms. Smith, that a confidential informant indicated he could possibly buy

6  drugs from an individual working at the recreation center.  (*See*, Pickers Dep., pp. 8-11,

7  ll. 24-7).[6]  Although he did not believe the information sufficient to obtain a warrant at the

8  time, the detective passed this information on to Defendant Hester with the intention that

9  someone would take a second look.  (Pickers Dep., p. 13, ll. 17-25).  Such information, when

10  coupled with the further statements Defendant Hester received from Ms. Taylor, forms a

11  solid, good-faith basis for his statements to Ms. Smith.

### 2.  Even Plaintiff agrees that the areas of Hester's concerns regarding suspicion of illegal drug activity and public workplace misbehavior are legitimate and appropriate.

14       Plaintiff also admitted that Defendant Hester's comments targeted areas of legitimate

15  concern to Plaintiff's public employers, the School District and County.  Regarding suspicion

16  that an employee of the Jackpot Rec Center was using drugs, Plaintiff was unequivocal that

17  such behavior should not be tolerated.  He further indicated that the background of the people

18  working in the Rec Center – like himself – was important as well:

> Q:    Did you feel, as the supervisor of the rec center, that you had any obligation to ensure that those people that were there, who had the care, custody and control of others children, were not under the influence of an illicit drug?
>
> A:    Absolutely.
>
> Q:    Was it important to you to know the background or history of the employees that you were employing, who you were entrusting the care, custody and control of people's children to?
>
> A:    Yes.

(Pike Dep., p. 151, ll. 8-18).

---

[6].  True, accurate and correct copies of the cited portions from the transcript of Richard Pickers's deposition, taken March 6, 2013, along with the caption and reporter's certificate, are attached to Defendants' Motion as "Exhibit 4."

ERICKSON, THORPE & SWAINSTON, LTD.

Current Recreation Center interim director Travis Hartman likewise explained that the facility is a place for children, and felt it was obvious that employees should not use or sell illegal drugs. (Hartman Dep., p. 12, ll. 11-20).[7]  In discussing Defendant Hester's complaints to Plaintiff's County supervisor, Plaintiff whole-heartedly agreed that Hester had a legitimate right to air those concerns:

> Q:   Do you have anything that would suggest that he didn't have that right [to make a complaint regarding Plaintiff to the County], whether he was a police officer, a town board member or an ordinary citizen?
>
> A:   That he doesn't have that right?
>
> Q:   Sure.
>
> **A:   No.  I don't have any idea why he doesn't have that right.  I would have done it, I'm quite certain.**
>
> Q:   What they were doing was wrong, correct?
>
> A:   Absolutely.
>
> Q:   It was dangerous?
>
> A:   It was foolish.
>
> Q:   It put the county at risk?
>
> A:   Absolutely.

(Pike Dep., p. 179, ll. 13-25) (emphasis added).

In discussing Defendant Hester's complaints to Plaintiff's school-district supervisors, Plaintiff admitted not only that suspected use of illegal drugs by school employees is a legitimate concern, but that at least a portion of Defendant Hester's concerns were justified and correct.  As noted in Plaintiff's Complaint, Defendant Hester suspected illegal drug use by both Plaintiff and his Assistant Coach, Jorge Perez.  Plaintiff's District supervisors apparently "took him at his word" that he was no longer a "pothead."  (*See*, Smith Dep., p. 33, ll. 4-11) (Pl's Compl. (#1), ¶ 2(B).  Plaintiff's assistant coach, however, was not so lucky:

---

[7].  True, accurate and correct copies of the cited portions from the transcript of Travis Hartman's deposition, taken March 6, 2013, along with the caption and reporter's certificate, are attached to Defendants' Motion as "Exhibit 5."

ERICKSON, THORPE & SWAINSTON, LTD.

11

1    Q:    Was there an allegation against some coach that was
2          using illicit drugs?

     A:    That's my assistant coach.
3
     Q:    Which is whom?
4
     A:    Jorge Perez.
5
     Q:    And what year did that occur?
6
     A:    That was 2011.
7
     Q:    And that was in the fall of 2011, August/September time
8          frame; is that correct?

9    A:    That season, yeah.  That was the same meeting that they
           had with us, us two, Jorge and I, when Ms. Smith had
10         brought up allegations that Jorge was the one – I don't
           know, actually.  I believe they talked to Jorge on his own
11         on that one.

12   Q:    All right.  Were you aware that Jorge Perez was told that
           he was going to have to take a drug test?
13
     A:    After the fact.
14
     Q:    Who did you learn that from?
15
     A:    [Jackpot Combined School Principal] Mr. Messmer.
16
     Q:    And did Mr. Messmer tell you that Jorge said, I'm not
17         going to take the test because I'd fail it?

18   A:    Yes.

19   Q:    And do you believe that Mr. Messmer accurately
           reported what Mr. Perez had told him?
20
     A:    To the best of my knowledge.
21
     Q:    Prior to that point in time, were you aware that Mr. Perez
22         was using illicit drugs?

23   A:    No.

24   Q:    Had no idea about it?

25   A:    No idea about it.

26   Q:    Did you ever learn from Mr. Perez what illicit drug it was
           that he believed he was going to test positive for?
27
     A:    Yes.
28

1    Q:    What was that?

2    A:    He told me marijuana.

3  (Pike Dep., pp. 145-146, ll. 11-21).

4    In her deposition, Ms. Smith confirmed that Mr. Perez left because of the drug

5  concerns reported by Mr. Hester, which were obviously valid.  (Smith Dep., pp. 23-24,

6  ll. 11-16; p. 26, ll. 3-5).[8]  She also testified she felt Mr. Hester's concerns about drug use and

7  improper coaching techniques were both legitimate and important, and that she was "[n]ot

8  at all" offended that Mr. Hester brought them to her.  (Smith Dep., p. 25, ll. 21-25; pp. 47-49,

9  ll. 6-1; p. 61, ll. 18-21).  When she related Mr. Hester's concerns, Plaintiff actually admitted

10  to historical use of marijuana.  (Smith Dep., pp. 29-30, ll. 18-4).  However, instead of

11  demanding that Mr. Pike be tested like Mr. Perez, for some reason Ms. Smith simply took

12  him at his word that he was no longer using drugs.  (Smith Dep., p. 33, ll. 4-11).  Ms. Smith

13  testified that, in retrospect, she "certainly" wishes she had tested Plaintiff for drugs after her

14  meeting with Mr. Hester.  (Smith Dep., p. 28, ll. 15-18).

15    It is undisputed that Plaintiff had contact with youth as a coach of the football team

16  and as a supervisor at the Recreation Center, and there is no question that Plaintiff's history

17  of illegal conduct in the form of drug abuse is a matter that reasonably concerned the School

18  District.  In *John v. Douglas County Sch. Dist.*, the Nevada Supreme Court specifically held

19  that matters which address a school's environment as it applies to the staff and students are

20  "of reasonable concern" to the School District.  *See, John v. Douglas County Sch. Dist.*, 219

21  P.3d 1276, 1287 (Nev. 2009).  Defendant Hester's statements pertained to an individual who

22  had close contact with youth and concerned child safety.  Defendant Hester had legitimate

23  concerns about Plaintiff serving in the capacity of a high school football coach and

24  supervisor at the Recreation Center due to his (now-admitted) history of illegal conduct and

25  lack of judgment.  Additionally, the personal background and past conduct of a football

26  coach and recreational center employee are very important to his public employers, even if

27

28    [8].  True, accurate and correct copies of the cited portions from the transcript of L. Kim Smith's deposition, taken March 6, 2013, along with the caption and reporter's certificate, are attached to Defendants' Motion as "Exhibit 6."


ERICKSON, THORPE &
SWAINSTON, LTD.

13

1    the conduct in question occurred several years before they were hired.  One of the primary

2    concerns that any school district has is the safety and well-being of its students.  Because

3    coaches have direct access to students, school districts are obviously concerned with their

4    personal background, as well as their behavior both on and off school premises.

5              **C.      Defendant Hester's protected statements to Kim Smith.**

6              The first area of protected activity involves Defendant Hester's alleged statements to

7    the Ms. Smith.  (*See*, Pl's Compl. (#1), ¶¶ 51-60).  As the Court knows, Plaintiff alleges

8    Defendant Hester approached Ms. Smith on September 22, 2011, in her office at the school.

9    Plaintiff alleges that, at that time, Defendant Hester aired his concerns regarding suspected

10   drug use by Plaintiff and his assistant Mr. Perez.  (Pl's Compl. (#1), ¶ 51).  Plaintiff also

11   referenced this incident during his testimony at the TPO Hearings.  (*See, e.g.*, TPO

12   Hearing #2 (Exh. 8), p. 44, ll. 7-15).[9]  The Complaint alleges Defendant Hester called

13   Plaintiff a "pothead [and] one of Jackpot's biggest druggies," telling Ms. Smith Plaintiff had

14   "just threw his bong and pipe away a couple of weeks ago" during the meeting.  (Pl's

15   Compl. (#1), ¶ 52).  Defendant Hester's aim in making these comments, according to

16   Plaintiff's Complaint, was to "paint Plaintiff in a negative light . . . in an effort to have

17   Plaintiff removed as Head Coach of the Jackpot Football Team . . . ."  (Pl's

18   Compl. (#1), ¶ 53).

19             Although Plaintiff's Complaint generally alleges Defendant Hester's concerns were

20   false and unfounded, there is no doubt Defendant Hester was truly concerned about the issues

21   he raised before this public school district official.  (*See*, Hester Aff., ¶¶ 1-2).[10]  This is

22   consistent with the information and testimony provided by Ms. Smith, both via her deposition

23   cited above and during the TPO extension hearing.  There, Ms. Smith also testified to her

24

25             [9].  True, accurate and correct copies of the cited portions of the December 12, 2011,
26   Hearing transcript are included with this Motion as "Exhibit 7."  True, accurate and correct
     copies of the cited portions of the April 2, 2012, Hearing transcript are included with this Motion
27   as "Exhibit 8."

28             [10].  A true, accurate and correct copy of the Affidavit of Defendant Hester, dated
     August 6, 2012, and previously included with Defendants' initial Special Motion (#13), is
     included with this Motion as "Exhibit 9."

1   concern regarding Plaintiff's actions:

2        Q:    Now, Mr. Hester came into your office and wanted to
              talk to you. **Basically was registering a complaint with**
3              **you, correct?**

4        **A:**    **Yes, uh-huh, a concern that he had.**

5        Q:    Can you tell me what that concern was?

6        A:    Yes. Brad came into my office. He was in uniform, and
              into our conversation shortly thereafter, he covered his
7              badge and he said, "I'm here as a concerned parent."

8        And he was upset that Mr. Pike took the boys to the ranch,
          which is just outside of Jackpot, to buck bales, because his son
9        Daren is very allergic and was broke out in hives, and he was
          upset with Mr. Pike for making it a required practice.

10

11      And I had assured Mr. Hester that it wasn't a required practice,
          because I had that very conversation with Rick that morning
12      saying, "You know, this shouldn't be a required practice."

13      And he said, "No, it wasn't." He said, "I told the kids we
          weren't going to go out and buck bales," and I had reassured
14      Mr. Hester that that was the case. However, Brad said, no, that
          he had talked to one of the ranch hands there and Rick said it
15      was required.

16      And so it was initially there to talk about his son Daren. And
          then the conversation turned to, he said, "Well, you know, Rick
17      is one of the biggest potheads in town and that he just recently
          threw away his bong and pipe." And –

18                 *      *      *

19        **Q:**    **Was this – you were concerned enough about this that**
20              **you took this information to your principal; is that**
              **correct?**

21        **A:**    **Yes. I told Mr. Hester that I appreciated him coming**
22              **in and that I would be talking to [School Principal]**
              **Mr. Mesmer and the coaches.**

23   (TPO Hearing #1 (Exh. 7), pp. 34-35, ll. 13-16; pp. 37-38, ll. 22-3) (emphasis added).

24        Defendant Hester further testified he reasonably believed his statements to be true

25   based on the statement of a witness who was "present when [Plaintiff] had thrown away a

26   bong and a [marijuana] pipe." (TPO Hearing #1 (Exh. 7), pp. 92-93, ll. 25-5; p. 100,

27   ll. 13-24). As set forth in detail above, discovery in this case has revealed that Ms. Taylor

28   provided this information to Defendants Hester and Munson. With her intimate knowledge

ERICKSON, THORPE &
SWAINSTON, LTD.

15

1    of Plaintiff, this information was certainly from a reliable source.  Likewise, the evidence

2    shows that gossip around town – stretching back to Plaintiff's days working for Cactus

3    Pete's – was that Plaintiff had "always been a user."  (Barrus Dep., p. 23, ll. 5-6).  One

4    witness testified she heard that information from "[t]he whole town," and that it was nothing

5    new. (Barrus Dep., p. 23, ll. 1-13; p. 24, ll. 13-24).  And another witness testified to similar

6    information. (*See*, Hartman Dep., pp. 13-14, l. 2; p. 18, ll. 4-15) (Plaintiff's companion told

7    witness the two of them had "smoked a doobie").  Such evidence easily supports the

8    conclusion that Defendant Hester's statements to Ms. Smith were made in good faith for the

9    purposes of the immunities at issue here.

10        And it is also important to note Defendant Hester's concerns were aired in good faith,

11   to an official of the Elko County School District, **with the intention that this governmental**

12   **entity look further into these allegations and take action if appropriate.**  (*See*, Hester

13   Aff., ¶ 2).  At least a portion of Defendant Hester's concerns – *i.e.*, Plaintiff's choice of

14   punishment for the football players' poor play – directly involved an issue already under

15   consideration by School Administration.  As Ms. Smith testified, she had "had that very

16   conversation with [Plaintiff] that morning saying, 'You know, this shouldn't be a required

17   practice.'"  (TPO Hearing #1 (Exh. 7)).  This supports the conclusion that such

18   communications were (1) aimed at procuring governmental action – *i.e.*, that Plaintiff's

19   public employer either ensure he was doing his job or terminate his employment – and,

20   (2) pertained to matters of concern to this governmental entity.  And Plaintiff himself

21   admitted the critical importance of ensuring that public employees in the care of children are

22   not drug users, which quite frankly should be obvious.

23        **D.    Defendant Hester's protected statements to Lynn Forsberg.**

24        The second area of protected activity raised by Plaintiff involves Defendant Hester's

25   alleged expressions of concern regarding Plaintiff's suspected drug use and other

26   employment issues to Elko County Public Works Director Lynn Forsberg.  (*See*, Pl's

27   Compl. (#1), ¶¶ 19-20).  During the TPO Hearings, Mr. Forsberg outlined the concerns

28   Defendant Hester related to him during this period.

ERICKSON, THORPE &
SWAINSTON, LTD.

1  | Q: | You had an occasion to have a discussion with Mr.
2  |    | Hester about Mr. Pike; is that correct?

3  | A: | Yes.

4  | Q: | And can you tell the Court what happened – I believe it
   |    | was in September, I think is when it was; is that correct?

5  | A: | Yes.  In September Mr. Hester – I was leaving town after
6  |    | a meeting and he stopped me and talked to me about
   |    | things that were going on at the recreation center.

7      And during the the course of that conversation, he mentioned
8      that the storage shed at the rec center looked like it was off of
       the show "Hoarders," and also told me that Mr. Pike and the
9      person who is the assistant football coach at that time were drug
       users.  And I don't remember his exact words, but asked me at
10     the time if I would have a problem with him taking his drug dog
       through the recreation center.

11                              *         *         *

12 | Q: | Okay.  And when he was talking to you about Mr. Pike,
   |    | did this take you by surprise?

13 | A: | We had had conversations before and he had told me his
14 |    | suspicious before, but nothing had ever came from that.

15 | Q: | Okay.   And you mean you have had conversations
16 |    | before,  you  have  had  conversations  before  with
   |    | Mr. Hester?

17 | A: | Yes.

18 (TPO Hearing #1 (Exh. 7), pp. 50-51, ll. 16-2; p. 52, ll. 1-8).

19     Mr. Forsberg further testified about Defendant Hester's concerns as follows:

20 | Q: | Okay.  And do you recall him also – do you recall at any
21 |    | point him telling you that he also believed that Mr. Pike
   |    | was dealing Ecstasy?

22 | A: | Actually, it wasn't so much – no, I don't recall him
23 |    | saying that Mr. Pike was dealing Ecstasy.  He named
   |    | another person that worked at the – at the rec center
24 |    | selling Ecstasy.

25 | Q: | Okay.   Would  that  have  been  one  of  Mr. Pike's
   |    | employees?

26 | A: | Yes.

27     ///

28     ///

ERICKSON, THORPE &
SWAINSTON, LTD.                              17

1

2

3

> **Q:      Okay.  Do you recall how many times prior to this time that Mr. Hester, Deputy Hester, had told you that – expressed his concerns about Mr. Pike using drugs?**
>
> **A:      I don't recall the exact number.  I would say not necessarily always drugs, but his performance at the recreation center, you know, his job activities, his after work-activities, but at least on one other occasion about the drugs.**

4

5

6

7   (TPO Hearing #1 (Exh. 7), pp. 52-53, ll. 22-15) (emphasis added).

8          Defendant Hester testified that he did, in fact, report his concerns about Plaintiff to

9   Mr. Forsberg.  (*See, e.g.*, TPO Hearing #1 (Exh. 7), p. 89, ll. 4-23).  Again, Defendant

10  Hester's concerns were held and expressed in good faith, based on the information in his

11  possession at the time.  (Hester Aff., ¶ 2); (TPO Hearing #1 (Exh. 7), pp. 92-93, ll. 25-5;

12  p. 100, ll. 13-24).  In addition to the information from Ms. Taylor and the rumors about town

13  expressed above, and in retrospect there is also Plaintiff's admission he has used illegal

14  drugs, Defendant Hester was also aware of the "lead" provided to him by the NDI detective.

15  (*See*, Pickers Dep., pp. 8-11, ll. 24-7; p. 13, ll. 17-25).  This information caused him to be

16  critically concerned that Mr. Pike or employees under his watch may have drugs near

17  children, which Plaintiff himself testified to be a critical concern.  (Pike Dep., p. 151,

18  ll. 8-18).  As with Plaintiff's statements to Ms. Smith, his statements to Mr. Forsberg fit

19  perfectly into the Anti-SLAPP provisions because they were both targeted at procuring

20  governmental action and pertained to matters of concern to this governmental entity.  These

21  statements are the very essence of petitioning activity protected both by Nevada's

22  Anti-SLAPP provisions and the *Noerr-Pennington* doctrine.

23  **III.   LEGAL ARGUMENT**

24       **A.    Procedural authority and Motion standard.**

25          Unlike Defendants' initial Special Motion to Dismiss (#13), the entirety of the instant

26  Motion is to be adjudicated under the burden-shifting procedure of the federal summary

27  judgment standard.  *Verizon Delaware, Inc. v. Covad Comm. Co.*, 377 F.3d 1081, 1091 (9th

28  Cir. 2004) ("defendants sued in federal courts can bring Anti-SLAPP motions to strike state

law claims and are entitled to attorneys' fees and costs when they prevail.") (*citing, Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1109-10 (9th Cir. 2003); *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 971 (9th Cir. 1999)).  In order to defeat this Motion, Plaintiff must point to admissible evidence supporting the elements of his challenged claims.  For the purposes of summary judgment, "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also, Garity v. Potter*, 2008 WL 872992 (D. Nev. 2008) (uncorroborated and self-serving testimony, without more, will not create genuine issue of material fact).

Pursuant to Nevada's Anti-SLAPP statute, if a lawsuit arises as a result of a good faith communication in furtherance of the right to petition, the person(s) against whom the lawsuit is brought may file a special motion to dismiss. *See*, NRS 41.660(1).  Upon the filing of such a Motion, the Court "shall treat the motion as a motion for summary judgment." *See*, NRS 41.660(3)(a).  As explained below, this means Plaintiff's claims against these Defendants must be dismissed unless he can affirmatively demonstrate, through admissible evidence, a probability of success on each element of each challenged claim. *See*, NRS 41.635, *et seq*.  Should the Court grant the special motion, "the dismissal operates as an adjudication upon the merits." *See*, NRS 41.660(4).

The evidence described herein leaves no doubt Plaintiff's claims are impermissibly predicated upon alleged action in furtherance of these Defendants' First Amendment Rights to Petition.  Coupled with Plaintiff's inability to demonstrate any likelihood of success, Plaintiff's claims necessarily fail and should be dismissed pursuant to the points and authorities presented herein.

**B.    Nevada's Anti-SLAPP statute mandates dismissal of Plaintiff's State-law claims, which are based on actions protected by Defendants' First Amendment rights of freedom of speech and petition.**

**1.    Nevada's Anti-SLAPP Statute.**

In 1993, the Nevada Legislature enacted legislation under NRS Chapter 41 entitled "Liability of Person who Engages in Right to Petition."  The legislation was introduced in response to the vast number of retaliatory SLAPP lawsuits being brought against citizens


ERICKSON, THORPE &
SWAINSTON, LTD.

who petitioned government.  *See*, S.B. 405, Nev. S. Jud. Comm., 38 (1993).[11]   The Legislature's effort provided "immunity from civil liability for claims based upon a good faith communication to a legislator, officer or employee of the Federal Government." *Id.*, at 2.  In 1997, the Legislature revised the provisions governing immunity for persons engaging in communication in furtherance of the right to petition.  *See*, A.B. 485, Nev. Assem. Jud. Comm., 1 (1997).[12]   The bill implemented procedures for defendants to file a special motion to dismiss if the action is brought against a person, business or organization who engaged in such good-faith communication based on exercising the First Amendment Right to Petition. *See, id.*; *see also*, NRS 41.635, *et seq.* (note).  In so doing, the Legislature explained "[i]t is essential to our form of government that the constitutional rights of citizens to participate fully in the process of government be protected and encouraged." *Id*.

As it currently stands, the statute provides that **"[a] person who engages in a good faith communication in furtherance of the right to petition is immune from civil liability for claims based upon the communication."**  NRS 41.650 (emphasis added).  Examples of such good-faith communications under NRS 41.637 include the following:

> 1.    Communication that is aimed at procuring any governmental or electoral action, result or outcome;
>
> 2.    Communication of information or a complaint to a Legislator, officer or employee of the Federal Government, this state or a political subdivision of this state, regarding a matter reasonably of concern to the respective governmental entity; or
>
> 3.    Written or oral statement made in direct connection with an issue under consideration by a legislative, executive or judicial body, or any other official proceeding authorized by law, which is truthful or is made without knowledge of its falsehood.

NRS 41.637.

///

---

[11].  A true, accurate and correct excerpt of the referenced legislative history is attached hereto as "Exhibit 10."

[12].  A true, accurate and correct excerpt of the referenced legislative history is attached hereto as "Exhibit 11."

1            **2.**      **The Nevada Supreme Court recently recognized Anti-SLAPP's**
                 **applicability in lawsuits such as this, which are brought for the**
2                  **purpose of chilling the right to petition.**

3       In *John v. Douglas County Sch. Dist.*, 219 P.3d 1276 (Nev. 2009), the Nevada

4 Supreme Court for the first time rendered a decision applying Nevada's Anti-SLAPP statute.

5 Mr. John, a security guard at Douglas County High School, was disciplined after an

6 investigation revealed that he had engaged in unprofessional and improper conduct. *Id.*, at

7 1278. He was suspended and eventually terminated at the conclusion of the school district's

8 investigation. *Id.*, at 1279. Mr. John filed a union grievance related to his discipline, and

9 filed serial litigation against those who testified at the grievances or participated in the

10 investigation. *Id.*, at 1280. The school district filed a Special Motion to Dismiss pursuant

11 to NRS 41.635, *et seq.*, which was granted by the District Court and upheld by the Nevada

12 Supreme Court, *en banc*. *Id.*

13       In its decision, the Court recognized that "SLAPP lawsuits abuse the judicial process

14 by chilling, intimidating, and punishing individuals for their involvement in public affairs."

15 *Id.*, at 1281. The Court recognized that "representative democracy demands that citizens and

16 public officials have the ability to openly engage in discussions of public concern." *Id.* That

17 discussion of public concern is precisely the conduct contemplated by Nevada's Anti-SLAPP

18 legislation. The Court looked to comments made by a State Senator on S.B. 405, and

19 recognized that "Nevada's Anti-SLAPP statute is predicated on protecting 'well-meaning

20 citizens who petition the government and then find themselves hit with retaliatory suits

21 known as SLAPP suits.'" *Id.*

22       The allegations of Plaintiff's Complaint (#1) here concerning statements made by

23 Defendant Hester are precisely the kind of petitioning activity protected by Nevada's

24 Anti-SLAPP statute. As explained above, Defendant Hester testified he reasonably believed

25 these statements because Ms. Taylor provided this information to Defendants Hester and

26 Munson. With her intimate knowledge of Plaintiff, this information was certainly from a

27 reliable source. Moreover, "[t]he whole town," was aware that Plaintiff had "always been

28 a user." (Barrus Dep., p. 23, ll. 1-13; p. 24, ll. 13-24); (*see also*, Hartman Dep., pp. 13-14,

l. 2; p. 18, ll. 4-15) (information that Plaintiff "smoked a doobie").  Such evidence easily

supports the conclusion that Defendant Hester's statements to Ms. Smith were made in good

faith for the purposes of the immunities at issue here.

This type of communication fits squarely within the statute's concern for protecting

well-meaning citizens who petition the government.  Defendant Hester's statements fit within

the Anti-SLAPP provisions because they were both targeted at procuring governmental

action and pertained to matters of concern to this governmental entity.  Defendant Hester's

right to petition is guaranteed by Nevada's Anti-SLAPP statute and by his First Amendment

rights. (*See, e.g.*, Pike Dep., p. 179, ll. 13-25) (Plaintiff does not contend Defendant Hester

is barred from airing grievances to government entities).  Such activity may not be used as

the basis for a civil action.

### 3.    Plaintiff's claim fails under Nevada's Anti-SLAPP standard.

As noted above, this Renewed, Joint Special Motion to Dismiss is to be treated as a

motion for summary judgment, in accord with this Court's prior Order (#51). *See, John*, 219

P.3d at 1281.  Here, Defendants have met their threshold showing that the lawsuit is based

on good faith communications made in furtherance of the right to petition the government.

*Id.*, at 1282.   The burden of production therefore shifts to Plaintiff, who must now

demonstrate a genuine issue of material fact.  *Id*.  It is not sufficient for Plaintiff to simply

allege Defendant Hester's communications were malicious, because these Defendants have

demonstrated that Mr. Hester had a good-faith basis for believing those matters at the heart

of his oratory. *See, Papasan v. Allain*, 478 U.S. 265, 286 (1986) (*citing, Briscoe v. LaHue*,

663 F.2d 713, 723 (7th Cir. 1981)) (Court "not bound to accept as true a legal conclusion

couched as a factual allegation.").  Likewise, the allegation that Mr. Hester wanted Plaintiff

fired actually demonstrates the protected nature of Mr. Hester's statements, since Plaintiff's

termination from public employment would be a "governmental . . . action, result or

outcome" as referenced in Nevada's Anti-SLAPP statute.  *See*, NRS 41.637(1); *see also,*

*John*, 219 P.3d at 1279 (governmental action at issue pertained to suspension and eventual

termination of school district employee).

1    Under NRS 41.635, *et seq.*, the definition of "protected activity" consists of "good

2    faith communication in furtherance of the right to petition."  In describing this standard, the

3    Statute's Reviser's Note states as follows:

> The communications, information, opinions, reports, testimony,
> claims and argument provided by citizens to their government
> are essential to wise governmental decisions and public policy,
> the public health, safety and welfare, effective law enforcement,
> the efficient operation of governmental programs, the credibility
> and trust afforded government and the continuation of our
> representative form of government . . . .

8    NRS 41.635 (2007) (note).

9    For the purposes of analyzing immunity under Nevada's Anti-SLAPP statute, an

10   individual engages in a good-faith communication if his statement is truthful or made without

11   knowledge of its falsehood.  *See*, NRS 41.637(1)-(3); *see also, John*, 219 P.3d at 1286.  The

12   undisputed evidence in this case, as described below, establishes that Defendant Hester

13   believed the information he communicated to the School District officials and Mr. Forsberg

14   about Plaintiff was truthful, and at the time that he spoke with officials he had no knowledge

15   that any of the information was false.  The information that Defendant Hester communicated

16   to the School District about Plaintiff was acquired through conversations he had with

17   individuals with first-hand knowledge of Plaintiff's conduct and illegal behavior.  Equally

18   important, even if some of the information Defendant Hester provided to the School District

19   or Mr. Forsberg was ultimately false – which Plaintiff has alleged but not demonstrated –

20   Defendant Hester's communications were made in good faith because such statements were

21   made without actual knowledge the statements were false.  Indeed, there is absolutely no

22   evidence in the record indicating that Defendant Hester possessed knowledge that the

23   information he provided to the School District or Mr. Forsberg regarding Plaintiff's conduct

24   was false.

25   The *John* case is especially critical here, since both cases involve statements related

26   to the employment of school district employees.  It is precisely on point.  Any alleged contact

27   with the Elko County School District seeking to end Plaintiff's employment for misconduct –

28   which is exactly what Plaintiff alleges here – regarded a matter of public concern.  The same

ERICKSON, THORPE &
SWAINSTON, LTD.

23

goes for Defendant Hester's concerns about Plaintiff expressed to Elko County Public Works Director Lynn Forsberg.  (*See*, Pl's Compl. (#1), ¶ 20).  Plaintiff has the burden to produce contrary, admissible evidence on this point – as well as upon all the other elements of his claims – now, and his conclusory say-so is not sufficient.  Because the Complaint is based upon protected activity, Plaintiff cannot prevail on these claims.

### C.   Dismissal is likewise warranted under the *Noerr-Pennington* Doctrine.

#### 1.   *Noerr-Pennington* protects those who petition government.

The *Noerr-Pennington* doctrine is also fatal to Plaintiff's defamation-based claims. The U.S. Supreme Court established *Noerr-Pennington* immunity during consideration of anti-trust cases, upon the following statement of principle:

> In a representative democracy such as this, [the legislative and executive] branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives.  To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that act.

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 137 (1961).

The *Noerr-Pennington* doctrine derives from the First Amendment's guarantee of "the right of the people . . . to petition the Government for a redress of grievances."  Therefore, as with State Anti-SLAPP protection, those who petition any department of the government are generally immune from statutory liability for such conduct.  *Empress LLC v. City & County of S.F.*, 419 F.3d 1052, 1056 (9th Cir. 2005) (*citing, Manistee Town Center v. City of Glendale,* 227 F.3d 1090, 1092 (9th Cir. 2000).  The purposes of Nevada's Anti-SLAPP statute is similar to the purpose behind the *Noerr-Pennington* immunity doctrine.  *See, John*, 219 P.3d at 1281 (internal citations omitted).  While the doctrine was formulated in the context of antitrust cases, *Noerr-Pennington*'s rule of First Amendment immunity now enjoys "general applicability."  *Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001) ("[T]he uncertainty of the availability of a First Amendment defense when a

plaintiff brings a civil rights case now has been dispelled.").

The *Noerr-Pennington* doctrine's immunity protects those who petition the government from liability through a variety of means and, as noted above, has been extended to local government bodies and officials to immunize them, and those who petition them, from suit. *See, e.g., Village of Lake Barrington v. Hogan*, 649 N.E.2d 1366 (Ill. Ct. App. 1995) (*citing, Monarch Ent. Bureau, Inc. v. New Jersey Hwy. Auth.*, 715 F.Supp. 1290, 1301-03 (D.N.J. 1989); *Schneck v. Saucon Valley Sch. Dist.*, 340 F.Supp.2d 558 (E.D. Pa. 2004) (so held in context of § 1983 claim); *see also, Zeller v. Consolini*, 758 A.2d 376, 381 (Conn. Ct. App. 2000) ("Application of the *Noerr-Pennington* doctrine to the situation in this case – petitioning activity directed at local governments – already is well established.") (citing numerous cases on point).

Additionally, as one Court noted, it is of no moment whether a government employee acts in an official or individual capacity, since *Noerr-Pennington*'s analysis applies equally to both the municipality and its officials. *Fischer Sand & Agg. Co. v. City of Lakeville*, 874 F.Supp. 957, 959 (D. Minn. 1994). Specifically, that Court explained as follows:

> The fact that Defendants are governmental officials and acted in their official capacity does not deprive them of the protection of the *Noerr-Pennington* doctrine. **In fact, it is more likely that such governmental defendants act with the intent of advancing the public interest in exercising their First Amendment rights than private petitioners; this buttresses the justification for clothing the Defendants with immunity from suit arising from their petitioning activities.** In any event, the Court finds no reason that public officials and municipalities should receive any less protection under *Noerr-Pennington* than private petitioners, and thus concludes that all Defendants, including the City of Lakeville, fall within the scope of the *Noerr-Pennington* doctrine.

*Id.*, (emphasis added); *see also, Signad, Inc. v. Billboards Ltd., Inc.*, 1989 WL 128393 (Tex. Ct. App. 1989) (unpublished opinion) (actions by city council member and organization members immune under *Noerr-Pennington*).

The scope of *Noerr-Pennington* is thus broad indeed. As noted above, "[t]he right to petition the government, or to seek legal redress, does not confer legal protection solely on those persons formally addressing the governmental agency or formally filing a lawsuit."



ERICKSON, THORPE &
SWAINSTON, LTD.

1   *Ludwig v. Superior Court*, 37 Cal.App.4th 8 (Cal. Ct. App. 1995).  This principle has been

2   adopted by the Ninth Circuit, which recently held "the law of this circuit establishes that

3   communications between private parties are sufficiently within the protection of the Petition

4   Clause to trigger the *Noerr-Pennington* doctrine, so long as they are sufficiently related to

5   petitioning activity."  *Sosa v. DirecTV, Inc.*, 437 F.3d 923, 935 (9th Cir. 2006).

6        Here, as described in the Anti-SLAPP analysis above, Plaintiff's relevant claims

7   against these Defendants are entirely based on activities protected by the First Amendment

8   Right to Petition.  Defendant Hester's alleged statements, questions, and discussions to

9   Jackpot High's Dean of Students "in an effort to have Plaintiff removed as Head Coach of

10  the Jackpot Football Team" constitute protected petitioning activity. (*See*, Pl's Compl., ¶ 52).

11  Likewise, Defendant Hester's concerns about Plaintiff expressed Mr. Forsberg are protected,

12  especially where Plaintiff alleges they were made "in an effort to have Plaintiff fired as

13  Facilities Supervisor at the Jackpot Recreational Center." (*See*, Pl's Compl. (#1), ¶ 20).  And

14  the evidence, including Plaintiff's admissions, demonstrate that Mr. Hester enjoyed a good-

15  faith basis for his claims.  As alleged, these statements explicitly seek governmental action.

16  Plaintiff is not entitled to proceed where his claims against these Defendants are founded

17  upon such obviously protected activity.

18        **2.      The *Noerr-Pennington* sham exception is not applicable.**

19        Furthermore, Plaintiff simply cannot muster any evidence that would preclude

20  application of *Noerr-Pennington* under the "sham" exception to the First Amendment Right

21  to Petition.  *See, California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972).

22  Were Plaintiff to pursue this exception, he would be forced to demonstrate that Defendant

23  Hester's alleged communications were not genuinely aimed at procuring government action

24  at all.  Such a showing is impossible in this case, where Plaintiff specifically alleges that

25  government action – *i.e.*, Plaintiff's termination by Elko County and/or the Elko County

26  School District – was the actual target of Defendant Hester's statements.  (*See*, Pl's

27  Compl. (#1), ¶¶ 52, 20).

28  ///

1    Plaintiff cannot prevail under this exception merely by alleging that Defendants

2    genuinely sought to achieve a governmental result "but [did] so through improper means."

3    *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 508 n.10 (1988).  Instead,

4    Plaintiff must demonstrate that Defendant Hester's statements were not directed at

5    government action.  This distinction has discussed at length by the Court, which explored the

6    difference between attempts to achieve a governmental outcome for an improper purpose as

7    opposed to attempts to delay the efforts of a competitor by misuse of the governmental action

8    that the petitioner seeks.  *See, City of Columbia v. Omni Outdoor Adv., Inc.*, 499 U.S. 365

9    (1991).  The former category, of course, is protected by *Noerr-Pennington*.

10    It seems analysis of this exception is most often invoked in the context of petitioning

11    activity in the form of a preceding lawsuit, which is not truly analogous to the posture of this

12    litigation.  *See, e.g., Prof. Real Estate Inv., Inc. v. Columbia Pictures Indus., Inc.*, 508

13    U.S. 49, 60-61 (1993) (defining two-part test to determine whether underlying litigation is

14    "sham").  However, application of the "sham" exception in the context of local-government

15    petitioning activity was lucidly explained by the Fifth Circuit as follows:

16    The "sham" exception comes into play when the party
      petitioning the government is not at all serious about the object
17    of that petition, but engages in the petitioning activity merely to
      inconvenience its competitor. . . . [A] party who "petitions" the
18    government by engaging in administrative processes only to
      preclude or delay its competitor's access to those processes may
19    be liable for antitrust damages under the "sham" exception.

20    *Video Int'l Prod., Inc. v. Warner-Amex Cable Comm., Inc.*, 858 F.2d 1075, 1082 (1988).

21    Again, such is not the case here, where Plaintiff's Complaint specifically asserts that

22    Defendant Hester's intent was to "get Plaintiff fired from his job as Head Coach of the

23    Jackpot Combined School Football Team" and "to have Plaintiff fired as Facilities

24    Supervisor at the Jackpot Recreational Center."   (Pl's Compl. (#1), ¶¶ 59, 20).[13]

25    Furthermore, as noted by one intrepid State court interpreting the *Noerr-Pennington* doctrine:

26    ///

27

28    [13].  Defendants would again note the *John* Court's specific ruling that termination of a
      public employee constitutes governmental action for the purposes of Anti-SLAPP protection.
      *See, John v. Douglas County Sch. Dist.*, 219 P.3d 1276 (Nev. 2009).


ERICKSON, THORPE &
SWAINSTON, LTD.

27

The question whether the conduct at issue constitutes a mere sham, thus subjecting the actor to the potential of tort liability, is answered objectively, without consideration of the actors underlying motivation, no matter how improper it may be. The legality of objectively reasonable petitioning directed toward obtaining governmental action is not at all affected by any anticompetitve purpose the actor may have had. That a private party's motives are selfish is irrelevant under *Noerr-Pennington*.

*Fraser v. Bovino*, 721 A.2d 20, 27 (N.J. Ct. App. 1998) (quotations omitted).

The *Fraser* decision went on to explain that "[a] subjective test, which would of necessity require a consideration of underlying motivation, is both impractical and poses a risk of chilling a citizen's right to appear before local boards for fear of exposure to liability for damages." *Id*., at 27-28 (*citing, Prof. Real Estate Inv., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 59 (1993); *City of Columbia v. Omni Outdoor Adv., Inc.*, 499 U.S. 365, 380 (1991)). Plaintiff is not entitled to subvert this fact with general allegations of "malice" and "oppression," which is what Plaintiff has attempted to do here. (*See, e.g.*, Pl's Compl., ¶ 59). To the contrary, **"[b]ecause plaintiffs may easily allege that defendants knowingly and maliciously made false accusations, protecting such knowingly and maliciously made allegations provides breathing space for the First Amendment right to petition the government."** *Azzar v. Primebank*, 499 N.W.2d 793, 797 (Mich. Ct. App. 1993) ("knowing infliction of injury from petitioning does not render the campaign illegal because to hold otherwise would be tantamount to outlawing all such campaigns") (*citing, Havoco of America, Ltd. v. Hollowbow*, 702 F.2d 643, 649 (7th Cir. 1983)); *see also, Costal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983) (publicity and threats of litigation are activities protected by *Noerr-Pennington*).

These authorities show that Plaintiff's conclusory allegations of "malicious[ness]" – verified though they may be – are not sufficient to overcome the evidence demonstrating the good-faith nature of Mr. Hester's suspicion that Plaintiff used illegal drugs. (*See, e.g.*, Barrus Dep., p. 23, ll. 1-13; p. 24, ll. 13-24); (Hartman Dep., pp. 13-14, l. 2; p. 18, ll. 4-15); (Pike Dep., pp. 103-104, ll. 24-6; pp. 105-107, ll. 11-4) (detailing incidents where Plaintiff admitted to use of illegal drugs); (Taylor Dep., pp. 16-20, ll. 6-12; pp. 20-21, ll. 19-21). And



ERICKSON, THORPE &
SWAINSTON, LTD.

1   the "sham" exception is simply inapplicable.  There can be no doubt that Defendant Hester's

2   alleged statements targeted actual governmental action, *i.e.*, School District and/or County

3   action to terminate Plaintiff's employment.  (*See*, Pl's Compl. (#1), ¶¶ 59, 20).  In fact, that

4   is what Plaintiff specifically alleges.  Therefore, application of the *Noerr-Pennington*

5   doctrine cannot be avoided via the sham exception.  On the record presented here, there is

6   more than sufficient evidence to provide Defendants *Noerr-Pennington* protection.

7           **3.**     **The *Noerr-Pennington* doctrine also bars State claims.**

8         As a final note, the Ninth Circuit has recently ruled the *Noerr-Pennington* doctrine is

9   applicable to State-law claims such as those asserted by Plaintiff here.  *Theme Promotions,*

10  *Inc. v. News Amer. Mktg FSI*, 546 F.3d 991, 1007 (9th Cir. 2008).  As reasoned by the Ninth

11  Circuit in considering the Fifth Circuit's position, "[t]here is simply no reason that a

12  common-law tort doctrine can any more permissibly abridge or chill the constitutional right

13  of petition than can a statutory claim such as anti trust."  *Id.*, (*quoting, Video Int'l Prod.,*

14  *Inc. v. Warner-Amex Cable Comm., Inc.*, 858 F.2d 1075, 1084 (1988)).  Consequently, while

15  Nevada's Anti-SLAPP statute provides an alternative basis for dismissal of Plaintiff's State

16  claims at this time, this Court may also dismiss those claims under *Noerr-Pennington*.

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

ERICKSON, THORPE &
SWAINSTON, LTD.

1    **IV.      CONCLUSION**

2          As explained above, Defendants respectfully submit that Defendant Hester's alleged

3    activities are protected under Nevada's Anti-SLAPP provisions and the *Noerr-Pennington*

4    doctrine.   Defendants have presented sufficient evidence from discovery following this

5    Court's Order (#51) to warrant summary judgment in their favor on the Anti-SLAPP and

6    *Noerr-Pennington* defenses.   At the very least, Defendants have shifted the burden to

7    Plaintiff, who must now respond.   Plaintiff is required to muster affirmative, admissible

8    evidence demonstrating not only that Defendant Hester's statements were unprotected, but

9    also substantiating each element of his challenged claims.  Because this is impossible, those

10   claims must fail.

11         RESPECTFULLY SUBMITTED this 4th day of May, 2013.

12                                      ERICKSON, THORPE & SWAINSTON, LTD.

13

14                                              /s/ Brent Ryman
                                        THOMAS P. BEKO, ESQ. (#002653)
15                                      BRENT L. RYMAN, ESQ. (#008648)
                                        ERICKSON, THORPE & SWAINSTON, LTD.
16                                      99 West Arroyo Street
                                        P.O. Box 3559
17                                      Reno, Nevada 89505
                                        Telephone: (775) 786-3930
18                                      *Attorneys for Defendants Elko County,*
                                        *Munson, Keema and Pitts*
19   ///

20         RESPECTFULLY SUBMITTED this 4th day of May, 2013.

21                                      THORNDAL, ARMSTRONG, DELK,
                                        BALKENBUSH & EISINGER
22

23

24                                              /s/ Brent Kolvet
                                        BRENT T. KOLVET, ESQ. (#001597)
25                                      BRANDON R. PRICE, ESQ. (#11686)
                                        6590 South McCarran Blvd., Suite B
26                                      Reno, Nevada 89505
                                        Telephone: (775) 786-2882
27                                      *Attorneys for Defendant J. Brad Hester*

28



ERICKSON, THORPE &
SWAINSTON, LTD.                              30