1
2
3
4

**UNITED STATES DISTRICT COURT**

5

**DISTRICT OF NEVADA**

6

_____
)
7  RICHARD PIKE,                        )
                                        )
8            Plaintiff,                 )            3:12-cv-00283-RCJ-VPC
                                        )
9        vs.                            )
                                        )            **ORDER**
10  J. BRAD HESTER et al.,              )
                                        )
11           Defendants.                )
_____)

12

13       This case arises out of alleged defamation, illegal searches and seizures, and other

14  harassment of an Elko County employee by several deputy sheriffs based on a private dispute

15  between the employee and a deputy.  Pending before the Court is a Motion for Partial Summary

16  Judgment re Qualified Immunity (ECF No. 57).  For the reasons given herein, the Court grants

17  the motion in part and denies it in part.

18  I.       **FACTS AND PROCEDURAL HISTORY**

19           A.       **The Parties**

20           At the time the Verified Complaint ("VC") was filed, Plaintiff Richard Pike was

21  employed by Defendant Elko County (the "County") as the Director of the City of Jackpot

22  Recreation Center (the "Center"). (V. Compl. ¶ 10, May 25, 2012, ECF No. 1).  Plaintiff's

23

24

supervisor was Director of Elko County Public Works Lynn Forsberg. (*See id.* ¶ 19).  Defendants

J. Brad Hester and Sean Munson were employed by the County as deputy sheriffs with

Defendant Elko County Sheriff's Office ("ECSO"). (*Id.* ¶¶ 11–12).  Defendants Rick Keema and

Jim Pitts were also employed by the County as ECSO Under-Sheriff and Sheriff, respectively.

(*See id.* ¶¶ 13–14).  Plaintiff and Hester have a history of animosity arising out of Plaintiff's

previous supervision over Hester's minor child as assistant coach of a high school football team

during the Fall of 2008. (*See id.* ¶ 18).

### B.    The First Search

Plaintiff has had an office at the Center since about September 2007, where he keeps

personal property such as photographs. (*Id.* ¶¶ 21–23).  In or about August 2011, Hester (who

was at that time a sergeant), accompanied by Munson and ECSO Deputy Mike Moore, unlocked

one of the outer doors of the Center and searched the Center without a warrant, based upon the

pretense that Plaintiff was selling ecstasy to school children. (*See id.* ¶¶ 27–28, 34).  Once inside

the Center, Hester ordered Moore to conduct a dog sniff throughout the building. (*Id.* ¶ 29).

During the dog sniff, Hester unlocked the door to Plaintiff's office and searched it, including

Plaintiff's desk, without a warrant. (*Id.* ¶¶ 30, 34).  During the search, Hester seized an envelope

from Plaintiff's desk containing $500 that James Ward had left with Plaintiff to be given to

Plaintiff's God-son, Cody Ward, for travel expenses. (*Id.*).  Hester then ordered Moore to

perform a dog sniff of Plaintiff's office, and the dog did not react to anything. (*Id.* ¶ 31).  Hester

then asked Moore if he were "sure" there was nothing in the office and asked him to perform

another sniff "right here," pointing to Plaintiff's filing cabinet. (*Id.*).  Moore complied, and again

the dog did not react. (*Id.*).  Plaintiff did not have any illegal drugs, but he suspects that Hester

planted illegal drugs, i.e., ecstasy, during the search, and that the dog simply failed to react to them. (*See id.* ¶ 32).

In or about October 2011, ECSO informed Plaintiff of the August 2011 search. (*Id.* ¶ 38). Plaintiff presented a grievance to ECSO Lieutenant Marvin Morton about the search, and Morton promised to "look into it." (*Id.* ¶ 39). Plaintiff alleges that Under-Sheriff Keema's investigation into the illegal search on behalf of ECSO was intentionally deficient. (*See id.* ¶ 40). However, Sheriff Pitts and Under-Sheriff Keema ultimately "sustained" the investigation, meaning they found that an illegal search had occurred; still, as is their usual custom and practice, they refused to properly punish Hester, but rather downplayed his illegal conduct in order to shield him from civil liability and criminal prosecution, giving him only a written reprimand and three days unpaid leave. (*Id.* ¶ 41).

### C.    The Second Search

On or about October 25, 2011, Munson, accompanied by former ECSO Deputy Steve Church, while in uniform and without a warrant, picked the lock to an exterior door of the Center. (*Id.* ¶ 43). Munson and Church became trapped when a door locked behind them that they could not reopen, so they called Moore to free them. (*Id.* ¶ 44). Munson had broken into the Center multiple times in the past in order to teach deputies how to break into buildings. (*Id.* ¶ 45). Plaintiff consented to neither search, and Forsberg did not authorize either of them. (*Id.* ¶¶ 36–37, 46–47).

### D.    Hester's Defamation of Plaintiff

Hester ordered the illegal August 2011 search of the Center based upon the maliciously false pretense that Plaintiff was selling ecstasy to schoolchildren, which claim Hester made to

Forsberg, Munson, and Moore. (*Id.* ¶¶ 48–50).  On September 22, 2011, Hester went to the office of the Dean of Students and Athletic Director of Jackpot Combined School Kim Smith, to talk about Plaintiff and Jackpot Combined School Football Coach Jorge Perez. (*Id.* ¶ 51).  At the meeting, Hester maliciously told Smith that Plaintiff was a "pot head," "one of Jackpot's biggest druggies," and "just threw his bong and pipe away a couple of weeks ago." (*Id.* ¶ 52).  Hester made these allegations in order to have Plaintiff removed as Head Coach of the Jackpot Football Team so that Hester could secure that position for himself. (*Id.* ¶ 53).  The official letter in which Smith memorialized Hester's allegations has since been widely disseminated, adversely affecting Plaintiffs personal and professional reputation. (*Id.* ¶¶ 54–55).  In or about October 2011, Plaintiff and James Ward met with Lieutenant Morton to present a grievance concerning Hester's defamatory statements, and Morton promised to "look into it." (*Id.* ¶ 61).  Plaintiff believes that Morton conducted an internal affairs investigation, but Pitts, Keema, ECSO, and the County took no action against Hester as a result. (*Id.* ¶¶ 62–63).

### E.   Hester's Harassment and Plaintiff's Protective Orders Against Hester

After ECSO began the internal affairs investigation of Hester, Hester began driving his ECSO vehicle to Plaintiff's place of residence and work over the span of several months, up to seven times a day, in order to stop and stare at Plaintiff in a hostile and threatening manner. (*Id.* ¶ 64).  Hester did this in order to make Plaintiff fear for his life and safety, as well as the lives and safety of those around him. (*Id.* ¶ 65).

On November 15, 2011, Plaintiff filed an application for an Order of Protection Against Stalking, Aggravated Stalking, or Harassments against Hester with the Elko County Justice Court. (*Id.* ¶ 68).  Judge Al Kacin of that court entered a Temporary Order for Protection (the

"First TOP") that same day. (*Id.*).  At the December 12, 2011 hearing on the application, at least nine witnesses testified, and Judge Kacin later entered an Extended Order of Protection (the "EOP"), finding by a preponderance of the evidence that Hester had stalked Plaintiff in violation of Nevada Revised Statutes section ("NRS") 200.575(1). (*Id.* ¶ 69).  Judge Kacin specifically found: (1) Plaintiff felt frightened and intimidated by Hester's conduct, including the illegal search of his office and the "stop and stare" incidents; (2) Hester's conduct would have intimidated a reasonable person; and (3) Hester did not have lawful authority to search Plaintiff's office and that the search was colored by Hester's animosity towards Plaintiff. (*Id.*).  On March 2, 2012, Plaintiff filed a second application for an Order of Protection Against Stalking, Aggravated Stalking, or Harassments against Hester with the Elko County Justice Court. (*Id.* ¶ 70).  Judge Barbara Nethery of that court entered a Temporary Order for Protection (the "Second TOP") that same day. (*Id.*).

    **F.**    **The Present Case**

    Plaintiff sued the County, ECSO, Hester, Munson, Keema, and Pitts in this Court on ten causes of action: (1) Fourth Amendment violations under 42 U.S.C. § 1983 (all Defendants); (2) Defamation (Hester); (3) False Imprisonment (Hester); (4) Intentional Infliction of Emotional Distress ("IIED") (Hester); (5) Conversion (Hester); (6) Invasion of Privacy (Hester and Munson); (7) Negligent Hiring (Pitts, ECSO, and the County); (8) Negligent Retention (Pitts, ECSO, and the County); (9) Negligent Supervision (Pitts, ECSO, and the County); and (10) Respondeat Superior (ECSO and the County).

    The County and Hester jointly moved to dismiss the state law claims under Nevada's anti-SLAPP statute, and the Court denied the motion.  The Court ruled that Plaintiff had made

out a plausible case under the federal pleading standards as applied to the relevant state law substantive standards, including the anti-SLAPP defense, but that even if the Court were to have applied the state anti-SLAPP statute's evidentiary burden shifting procedure, the claims would survive, because the VC was verified and contained allegations sufficient to satisfy Plaintiff's shifted burden.

Plaintiff asked the Court to rule that the EOP barred certain issues from relitigation. The Court granted the motion in part, ruling that the findings in the EOP that Hester exceeded his lawful authority in willfully engaging in a course of conduct that would cause a reasonable person to feel intimidated and that Hester did not have lawful authority to search Plaintiff's office were precluded from relitigation. The Court noted that the ultimate issue of a Fourth Amendment violation had not been directly litigated and so must still be tried no matter how likely a finding of liability might be based on the precluded issue.

Defendants moved to preclude the admission of expert testimony by James Andre Boles. The Court granted that motion in part and denied it in part, precluding Boles's proffered testimony as to the law of the First and Fourth Amendments but not precluding his proffered testimony as to standards and practices of internal affairs investigations and his opinion as to the investigation in this case, subject to expert qualification at trial.

Plaintiff filed two motions for partial offensive summary judgment and a motion for leave to amend. First, Plaintiff asked the Court to grant him offensive summary judgment on his IIED claim based on the preclusive effect of the EOP. The Court denied the motion, leaving to a jury the issue of whether Hester's actions were "extreme and outrageous" under state law. Second, Plaintiff asked the Court to rule that the individual Defendants were not entitled to

qualified immunity against the § 1983 claim.  The Court found that Plaintiff had satisfied his initial burden to show that it would have been clear to a reasonable officer that the warrantless search of Plaintiff's office in August 2011 without consent and with no exigency was a violation of the Fourth Amendment.  The issue of the lawfulness of the search was in fact precluded from relitigation due to the EOP, at least as to Hester.  Defendants had provided no evidence in response to satisfy their shifted burden—they had not timely responded at all—so the Court granted the motion.  Third, Plaintiff asked for leave to amend to add four claims arising out of acts occurring after the date of the VC.  The Court granted the motion, permitting Plaintiff to file the proposed pleading attached to the motion.  Defendants asked the Court to bifurcate the trial as to the individual claims and the *Monell* claim against the County.  The Court denied the motion.

Defendants appealed the grant of offensive summary judgment on the issue of qualified immunity and asked the Court to reconsider.  The Court denied the motions.  First, Hester argued in his motion that he had discovered new information that undermined the EOP.  But the Court ruled that any attack on the EOP would have to be made through the state courts.  This Court could only find the EOP non-preclusive if there were evidence it had been vacated or otherwise voided, but Hester could not ask this Court essentially to review the state court's ruling.  Nor did it matter to the EOP's preclusive effect as against Hester that there were other parties to the present case.  Hester had also conflated issue preclusion with claim preclusion.  The Court already noted that the ultimate Fourth Amendment claim was not precluded, but the issues determined in the state court were.  Nor did the state court actions for orders of protection preclude the state law torts in this case, because there was no evidence those claims had been

litigated there.  Second, the other Defendants argued that the Court should not have granted qualified immunity against the § 1983 claim because they did not have a fair opportunity to respond.  The Court rejected that argument, but the Court of Appeals later reversed, finding that the response filed later the same day as the Court's order granting the motion had been timely.

While the timeliness of the response on the qualified immunity issue was on appeal, the Court adjudicated additional motions.  The Court granted defensive summary judgment to the County and ECSO as to any *Monell* liability but denied it to individual Defendants on the merits or based on discretionary immunity.  The Court granted Defendants' motion to strike the amended complaint for Plaintiff's failure to comply with the court order permitting amendment, because the order only permitting filing of the attached version of the complaint, but Plaintiff had filed a materially different version.  The Court denied Defendants' motion for summary judgment against the defamation and IIED claims under the anti-SLAPP statute and the *Noerr-Pennington* doctrine, noting that the Court had already ruled the VC itself was enough to sustain those claims against such a challenge.  The Court denied a separate motion for summary judgment (or to reconsider denial of summary judgment) against the Fourth Amendment claim and a substantive due process claim implied in the VC, though not separately listed.  The Court again denied summary judgment against the IIED claim.  The Court denied summary judgment against the conversion claim, noting that a taking of property from a bailee such as Plaintiff could support a conversion claim by the bailee for the benefit of the bailor.  The Court granted summary judgment against the false imprisonment claim but denied it on the invasion of privacy claim under a theory of intrusion upon the seclusion of another.  As to the defamation claim, the Court found that the alleged defamatory statements were defamatory per se, were not subject to

the affirmative defense of intra-corporate privilege as to statements made to Smith or Forsberg but might be as to statements made to Munson and Moore, and that because the alleged statements were about a matter of public concern and Plaintiff was a private plaintiff, Plaintiff would have to prove only negligence and falsity by a preponderance of the evidence to recover special damages but would have to prove malice by clear and convincing evidence to recover presumed or punitive damages.  The Court granted summary judgment against the negligent hiring claim.

The qualified immunity issue is back before the Court after interlocutory appeal.  At a status conference, the parties indicated the motion had been sufficiently briefed.

## II.   SUMMARY JUDGMENT STANDARDS

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court uses a burden-shifting scheme.  The moving party must first satisfy its initial burden.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and internal quotation marks

1    omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or

2    defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

3    an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

4    party failed to make a showing sufficient to establish an element essential to that party's case on

5    which that party will bear the burden of proof at trial.  *See Celotex Corp.*, 477 U.S. at 323–24.

6    　　　If the moving party fails to meet its initial burden, summary judgment must be denied and

7    the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*,

8    398 U.S. 144 (1970).  If the moving party meets its initial burden, the burden then shifts to the

9    opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v.*

10   *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute,

11   the opposing party need not establish a material issue of fact conclusively in its favor. It is

12   sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

13   parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

14   *Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid

15   summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor*

16   *v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the

17   assertions and allegations of the pleadings and set forth specific facts by producing competent

18   evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S.

19   at 324.

20   　　　At the summary judgment stage, a court's function is not to weigh the evidence and

21   determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477

22   U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are

23

24

to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely

colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

Notably, facts are only viewed in the light most favorable to the nonmoving party where there is

a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  That is, even

where the underlying claim contains a reasonableness test, where a party's evidence is so clearly

contradicted by the record as a whole that no reasonable jury could believe it, "a court should not

adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

## III.   ANALYSIS

To state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the

Constitution or laws of the United States was violated; and (2) that the alleged violation was

committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48

(1988).  There is no respondeat superior liability under § 1983. *See Monell v. Dep't of Soc.

Servs.*, 436 U.S. 658, 691 (1978).  Natural persons sued in their individual capacities may enjoy

qualified immunity against claims of constitutional violations. *Kentucky v. Graham*, 473 U.S.

159, 166–67 (1985).  An official is not entitled to qualified immunity if: (1) there has been a

constitutional violation; and (2) the state of the law was clear enough at the time of the violation

that a reasonable person in the defendants' position would have known his actions violated the

plaintiff's rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Courts have discretion to address

the second prong of the Saucier test first in order to avoid unnecessary constitutional rulings.

*Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  A "clearly established" right for the purpose of

qualified immunity is one that has been announced by the Supreme Court or the relevant Court

of Appeals, i.e., binding authority. *See Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004).

In order for Plaintiff to obtain offensive summary judgment on the qualified immunity issue, he must first show he is entitled to offensive summary judgment on the constitutional claim itself, because a constitutional violation is an element of a finding of no qualified immunity. *See Saucier*, 533 U.S. at 201.  The Fourth Amendment claim is based upon allegedly unlawful searches of the Center in August 2011 and October 2011. (*See* V. Compl. ¶¶ 21–47).

### A.     Pitts and Keema

Pitts and Keema are entitled to summary judgment against the Fourth Amendment claim, because there is no evidence they directed the search, ratified it after learning of it, or established any policy of warrantless searches.

### B.     The Second Search (Munson)

The Court grants summary judgment to Munson as to the second search.  There is no evidence Plaintiff's private office was searched during the October 2011 entry of the Center by Munson and Church, and Plaintiff therefore has no standing to complain of that search.  The only evidence is that Munson and Church broke into the Center, i.e., the exterior door, for the purpose of training Church how to do it.

### C.     The First Search (Hester and Munson)

Plaintiff provides evidence that the August 2011 search of his office at the Center was done without a warrant, in the absence of any exigency, and without the permission of either Plaintiff or Forsberg.  Plaintiff, Smith, Forsberg, Ward, Hester, Munson, and others testified at the EOP hearing. (*See* EOP add. 1, para. 2, ECF No. 57-1, at 2).  The findings in the EOP are precluded from relitigation here as against Hester, but not as against Munson.  The state court found by a preponderance of the evidence that Hester had stalked Plaintiff as defined in NRS

200.575(1), but had not harassed him or stalked him in an aggravated fashion as defined in NRS

200.571 and 200.575(2). (*See id.* add. 1, para. 3).  Although that finding cannot be relitigated, it

is relevant only to the invasion of privacy and IIED torts, not the Fourth Amendment claim under

§ 1983.  The EOP also states, "Pike testified that he applied for the Protection Order after Hester,

among other things; (a) conducted an unauthorized, warrantless search for controlled substances

in Pike's office at the Jackpot Recreation Center . . . ." (*Id.* add. 2, para. 1).  That statement does

not constitute a finding of an unlawful search, but only recounts Plaintiff's claim to that effect.

However, the EOP goes on to state:

>       Neither party disputes that Hester directed a "dog sniff" search of the
> Jackpot Recreation Center without a warrant and outside the presence of
> Forsberg, the Elko County Public Works Director ultimately responsible for the
> building.  However, Hester claims that he did so with the permission of Forsberg,
> and that Forsberg authorized a search outside the presence of public works
> employees.   Forsberg disputes that testimony.   Forsberg testified that he
> authorized a search *only* if conducted in his presence.
>
>       Given Forsberg's testimony, and especially given the animosity that
> existed between Pike and Hester at the time of the search, the court concludes that
> Hester did not have lawful authority to search Pike's office.  Hester, who wrote no
> customary investigative report following the search, did not have authority to
> conduct it even if the court credits his testimony that peace officers had
> information that illegal controlled substances were being kept and sold at the
> Jackpot Recreation Center.

*Id.* add. 2, para. 3 (footnote omitted).  The omitted footnote states:

>       The court finds it significant that no testimony established the reliability of
> the information to which Hester only referred in his testimony.   The court
> certainly cannot conclude that there was probable cause to search Pike's office on
> *this* record.  On *this* record, the court concludes that Hester's desire to search was
> colored by his animosity toward Pike.  At this point the court cannot conclude that
> the search was either lawful under the Fourth Amendment of the United States
> Constitution or done with MRS 200.571 "lawful authority."

*Id.* add. 2, n.1.

Even assuming the EOP were not preclusive against Hester, in his separate deposition taken in this case Forsberg testified that neither Hester, Munson, nor anyone else at ECSO were authorized to hold a key to the Center or Plaintiff's office within the Center. (Forsberg Dep. 23:13–16, 24:4–6, 24:24–25:6, ECF No. 57-1, at 48).  In August 2011, Hester had pulled Forsberg over by activating the overhead lights of his patrol car while in uniform and asked Forsberg if he could search the Center for drugs, because Hester believed Plaintiff and another person were selling drugs out of the Center. (*Id.* 26:9–28:12).  Forsberg told Hester that "if he wanted to search the recreation center, he could call me, and I would let him in." (*Id.* 28:17–19). Hester told Forsberg that he had a key, which Forsberg found troubling because Hester had no reason to have a key to the Center. (*Id.* 29:7–11).  Forsberg did not respond to Hester's statement that he had a key, but a few days later he had the locks changed after a meeting with Pitts, Keema, and County Manager Rob Stokes, which was the first time he had ever had to change the locks since he became Public Works Director in 1997. (*Id.* 29:16–30:16, 34:2–40:11).  Forsberg was not present during the August 2011 search, and he did not "direct" the search. (*Id.* 31:25– 32:3, 33:6–12).  Forsberg was aware of no other case where ECSO officers had searched county offices without a county representative being present. (*Id.* 33:22–34:1).

Plaintiff adduces an excerpt from an employee handbook (as do Defendants), which states, "County vehicles, lockers, desks, filing cabinets, files, etc. remain the property of the County and may be subject to *County initiated* searches at anytime and without notice." (Handbook § D2.5, ECF No. 57-1, at 66 (first emphasis added)).  Plaintiff also adduces Hester's deposition testimony, wherein Hester admitted that he conducted the August 2011 search out of uniform and while off shift, which he had never done in his 23-year career apart from 10–15

times he responded to calls as backup. (Hester Dep. 18:15–19:25, ECF No. 57-2, at 52).  It was

Hester's decision to search the Center; no superior instructed him to do it. (*Id.* 21:8–22:6; 28:19–

22).  He had never discussed the search with any other ECSO personnel except Munson and

Moore (who conducted the search with him at his direction). (*Id.* 26:5–10).  In his 23-year career

he had only conducted one other warrantless search (of a private apartment), not counting field

training searches of county buildings. (*Id.* 26:11–28:18).  The permission of the building

manager would always be obtained before field training searches. (*Id.* 28:23–29:6).  The August

2011 search was not a field training search. (*Id.* 28:9–12).  Hester had asked Forsberg for

permission to search the Center prior to the August 2011 search because "[h]e has final say over

that building." (*Id.* 29:22–30:5).  The ECSO policies and procedures regarding reports of

searches were not followed during the August 2011 search. (*Id.* 31:1–10).  A previous director of

the Center, Mr. Blake, had given Hester his key to the Center in the early 1990s so Hester could

lock the building without calling Mr. Blake if it were found accidentally unlocked at night, but

Mr. Blake did not give him the key so he could search the building. (*Id.* 31:21–32:13).  During

the August 2011 search, the drug dog searched the entire Center, including Plaintiff's office. (*Id.*

33:11–37:23).  The dog briefly alerted to a filing cabinet in a common area (not in Plaintiff's

office), but did not alert on a second sniff, and Hester never directed the dog to sniff anywhere

twice in Plaintiff's office. (*Id.* 36:4–15, 37:5–20).  The entire search of the building lasted about

ten minutes. (*Id.* 37:24–25).

      Moore, the officer who searched Plaintiff's office with Hester using the dog, testified that

Hester initiated the search without a warrant based on his belief that Plaintiff was selling drugs

such as ecstasy to schoolchildren, and that Moore had not been directed by any other County

official to conduct the search. (Moore Dep. 15:6–16:21, ECF No. 57-2, at 2).  Moore also reported at a December 2, 2011 interview with ECSO Sergeant Nick Czegledi that when he entered Plaintiff's office, he had not previously realized the door led to any office; he had always thought it was a utility closet. (Moore Interview Tr. 5:17–23, ECF No. 57-3, at 33).  Hester told Moore to check Plaintiff's office with his dog "Benz." (*Id.* 6:1–16).  Moore didn't see Hester open the door, which he knew was usually locked, and he didn't know how Hester opened it. (*Id.* 6:15–20).  Hester told Moore to have Benz search the office because it was Plaintiff's office and he thought narcotics such as ecstasy were inside. (*Id.* 6:23–25).  Benz walked around the room without alerting, and as the dog was walking out Hester made a comment that "stood out in my mind.  It really bothered me." (*Id.* 7:5–6).  Hester asked "Are you sure there's no narcotics in there?" (*Id.* 7:6–7).  When Moore replied that the dog hadn't alerted, Hester told him to check it again; Moore complied, but Benz again did not alert. (*Id.* 7:7–15).  It was Moore, not Hester as alleged by Plaintiff, who tapped on a file cabinet, but it was simply to engage and motivate the dog to search generally, not to direct a search of the cabinet in particular. (*See id.* 7:10–12).

     The Court finds that Plaintiff has provided enough evidence to satisfy his initial burden on summary judgment, i.e., to entitle him to a directed verdict on the qualified immunity issue at trial if his evidence went unrebutted.  Regardless of any local employer policies, "[s]earches and seizures by government employers or supervisors of the private property of their employees . . . are subject to the restraints of the Fourth Amendment." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987).  Such searches violate the Fourth Amendment when the conduct by the public employer infringes "an expectation of privacy that society is prepared to consider reasonable." *Id.* (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (internal quotation marks omitted)).  Factors

1   to consider in the office context are the intent of the authors of the Fourth Amendment, the uses

2   to which an individual has put the location, and the societal understanding that certain areas

3   deserve the most scrupulous protection from government invasion. *Id.* (citing *Oliver v. United*

4   *States*, 466 U.S. 170, 178 (1984)).  The *O'Connor* Court noted that it had long been settled that

5   one has a right to expect that "private" offices at a workplace will not be disturbed except by

6   personal or business invitees. *Id.* at 716–17 (citing *Mancusi v. DeForte*, 392 U.S. 364, 369

7   (1968)).  The expectation of privacy in a private office at a government workplace is not

8   unlimited, however:

9           Given the societal expectations of privacy in one's place of work
        expressed in both *Oliver* and *Mancusi*, we reject the contention made by the
10       Solicitor General and petitioners that public employees can never have a
        reasonable expectation of privacy in their place of work.  Individuals do not lose
11       Fourth Amendment rights merely because they work for the government instead
        of a private employer.  *The operational realities of the workplace, however, may*
12       *make some employees' expectations of privacy unreasonable when an intrusion is*
        *by a supervisor rather than a law enforcement official.*  Public employees'
13       expectations of privacy in their offices, desks, and file cabinets, like similar
        expectations of employees in the private sector, may be reduced by virtue of
14       actual office practices and procedures, or by legitimate regulation.

15  *Id.* at 717 (emphasis added).  In other words, according to the *O'Connor* plurality, under some

16  circumstances there may be no reasonable expectation of privacy in private government office

17  space as against the government employer, although there is still a reasonable expectation of

18  privacy in private government office space as against a law enforcement official searching in that

19  capacity.  The *O'Connor* plurality itself noted that although it believed a reasonable expectation

20  of privacy as against the government employer only applied in that case based on its facts, a

21  majority of justices held that personal government office space was categorically protected not

22  only from warrantless searches by the police (all nine justices agreed on that point), but also

23

24                                          17 of 23

from searches by the government employer. *See id.* at 718; *id.* at 730 (Scalia, J., concurring in the judgment); *id.* at 732 (Blackmun, J., dissenting).

The Court of Appeals has since found a reasonable expectation of privacy in private government offices as against law enforcement searches. *See, e.g.*, *United States v. Ziegler*, 474 F.3d 1184, 1189–90 (9th Cir. 2007) (citing *Mancusi v. DeForte*, 392 U.S. 364 (1968)) (noting that there is a reasonable expectation of privacy in one's work office, even if the office is shared). The intervening case of *City of Ontario, Cal. v. Quon*, 560 U.S. 746 (2010) does not change the analysis, because the *Quon* Court explicitly declined to resolve whether the plurality opinion in *O'Connor* controlled the reasonable expectation of privacy test in the government workplace context. *Id.* at 757. And that case is distinguishable from the present case even under the *O'Connor* plurality's viewpoint, because the police there searched the employee's phone in the capacity of an employer, not in the capacity of law enforcement investigators. *Id.* at 752–53.

Here, that means that the employee handbook cannot even have overridden Plaintiff's expectation of privacy in his office at the Center as against Forsberg, much less as against Hester and Munson. Regardless of the employee handbook, Forsberg cannot have conducted or permitted a warrantless search of Plaintiff's personal office space without Plaintiff's consent in the absence of an exigency. Even assuming for the sake of argument that the plurality viewpoint of *O'Connor* controls and that the employee handbook made Plaintiff's expectation of privacy as against Forsberg unreasonable, Plaintiff has provided evidence that would entitle him to a directed verdict as to the issue of whether Forsberg gave Hester consent to search the Center. Forsberg testified that he never gave Hester permission to search the Center. Forsberg remained silent when Hester noted he had a key, but even assuming further that silence in response to a

search request can constitute consent in some cases, *cf. United States v. Shaibu*, 920 F.2d 1423, 1427 (9th Cir. 1990), here Forsberg's implied consent was at best conditional, and the search without Forsberg clearly did not occur within those conditions:  Forsberg told Hester that "if he wanted to search the recreation center, he could call me, and I would let him in," (Forsberg Dep. 28:17–19).  Forsberg's statement would have been clear to a reasonable officer as constituting a refusal to permit a search out of Forsberg's presence, and it was clear even under the most generous reading of *O'Connor* that the only permissible way for a law enforcement official to search Plaintiff's private office at the Center would be with Plaintiff's or Plaintiff's employer's permission.

Munson, however, is not as culpable as Hester.  According to Munson, he was on duty and in uniform during the August 2011 search, but Hester was not on duty. (Munson Dep. 16:18–22, ECF No. 57-2, at 72).  Munson believed that Hester had permission to search from Forsberg. (*Id.* 18:1–5).  In fact, Hester told Munson before the search that he would attempt to obtain permission and a key from Forsberg. (*Id.* 34:17–20).  Plaintiff's office was "a very small room," and only Hester, Moore, and the dog entered Plaintiff's office, not Munson. (*Id.* 39:12–20).  The Court finds that Munson (who was not with Hester during the conversation with Forsberg) had the right to believe Hester had obtained Forsberg's permission when he accompanied Hester on the search.  And there is no evidence Munson himself even entered Plaintiff's office.

Defendants offer little in opposition apart from the employee handbook, but there is simply no evidence that the search here was "[c]ounty initiated," which is the type of searches the handbook permits.  Defendants argue that because Plaintiff knew or should have known his

office was subject to no-notice searches by Forsberg or other county officials, he had no reasonable expectation of privacy in his office as to a search by ECSO officers, either.  But that is simply wrong under *O'Connor*.  First, as noted, *supra*, only four of the *O'Connor* Court's members would have held that an employee handbook such as the one here could make government employer searches of employee's private offices reasonable under the Fourth Amendment.  A majority of justices would have held that such searches were just as presumptively unreasonable as similar searches by law enforcement officers.  Second, even assuming the plurality's viewpoint on the issue controlled on the law, Defendants have adduced no evidence by which a reasonable jury could find that Forsberg permitted the search.

Defendants also argue that the search was "County initiated" under the employee handbook, because ECSO is an arm of the County.  The Court rejects this argument.  First, it is clear that the County official with the ability to control access to the Center (Forsberg) did not permit the search.  Second, Defendants' reading of the provision would impermissibly obliterate the constitutional distinction between searches by law enforcement officials and non-law-enforcement government employers in every case where the government employer is part of a state or municipality that has its own law enforcement agency (which is most cases), a distinction that even the plurality in *O'Connor* found important.  Third, the reading is simply unreasonable. A statement that the "County" may search one's office cannot reasonably be read to mean any person working for the County.  It reasonably means a supervisor or superior county official. Under Defendants' reading, Plaintiff had no reasonable expectation of privacy as against a search of his private office by (and on the initiative of) a County-employed zookeeper.  The phrase

1    "County initiated" does not reasonably mean searches by the police on their own initiative in the

2    absence of the permission of those County officials having authority over the searched area.

3       Defendants also argue that dog sniffs are simply not searches under the Fourth

4    Amendment.  The Court of Appeals has ruled that an airport dog sniff of luggage that the owner

5    was not carrying at the time did not interfere with the owner's luggage in any meaningful way

6    and was therefore not a Fourth Amendment search. *See United States v. Beale*, 736 F.2d 1289,

7    1291–92 (9th Cir. 1984).  But private government offices have greater Fourth Amendment

8    protection than checked baggage areas at public airports.  Although the sniffs of the desks and

9    file cabinets here out of Plaintiff's presence cannot have annoyed him the same way as a sniff of

10   his person or property in his immediate possession, the same would be true of a sniff of the

11   interior of his residence while he was away.  The cases where courts have approved dog sniffs as

12   not constituting Fourth Amendment searches based on their low level of intrusiveness have

13   relied on the critical fact that the sniffs were conducted from places where the officer had a right

14   to be. *See, e.g.*, *Illinois v. Caballes*, 543 U.S. 405 (2005) (sniff of the exterior of an automobile in

15   public); *United States v. Lingenfelter*, 997 F.2d 632 (9th Cir. 1993) (sniff of the exterior of a

16   warehouse from a public alleyway).  Because dog sniffs are minimally invasive, they do not

17   implicate the Fourth Amendment when conducted in public areas unless they meaningfully

18   interfere with personal property or freedom of movement, *see Rodriguez v. United States*, 135 S.

19   Ct. 1609, 1616 (2015), but they are invasive enough to implicate the Fourth Amendment when

20   conducted in constitutionally protected areas, and where there is no express permission or at least

21   implied license for the officer to stand where he does when he conducts the search, the conduct is

22   not objectively reasonable under the Fourth Amendment, *see, e.g.*, *Florida v. Jardines*, 133 S.

23

24

Ct. 1409, 1415–17 (2013).  There is no evidence here indicating any express or implied invitation by either Plaintiff or Forsberg for Hester to have walked through Plaintiff's office with a dog sniffing about.

*Jardines* was not decided until after the August 2011 search, but the rule at issue here was already clear.  The crux of the dispute between the majority and the dissent in *Jardines* was not over whether a dog sniff conducted from a protected area constituted a Fourth Amendment search.  The *Jardines* dissenters agreed it had been clear for some time that an expectation of privacy in scents emanating from a protected area was only unreasonable as against those standing in places members of the public may lawfully stand. *See id.* at 1424–25 (Alito, J., dissenting).  The dissenters simply disagreed that the traditional common law license for persons to approach a home and stand on the porch excluded officers using dogs to detect emanations from within the home. *See id.* at 1421–24.  Here, there is no question that Hester and Munson were not in a place members of the public may lawfully stand (a locked private office in a locked government building after hours).

In summary, based on the evidence adduced there is no genuine issue of material fact that it would have been clear to a reasonable officer in Hester's position that the warrantless dog sniff of Plaintiff's private office space was unlawful.  The Court therefore grants summary judgment in favor of Plaintiff and against Hester on the qualified immunity issue as to the Fourth Amendment claim.

///

///

///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion for Partial Summary Judgment re Qualified Immunity (ECF No. 57) is GRANTED IN PART and DENIED IN PART.  Keema, Pitts, and Munson are entitled to summary judgment against the Fourth Amendment claim based on qualified immunity, but Plaintiff is entitled to summary judgment against Hester.

IT IS SO ORDERED.

]Dated this 7th day of September, 2016.

_____
ROBERT C. JONES
United States District Judge